# Manuel N. Pacheco, M.D.

14 February 2023
Emily C. Malarkey, Esq.
Bekman, Marder, Hopper, Malarkey & Perlin, L.L.C.
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21208

Dear Ms. Malarkey,

Please allow this letter to serve as a summary of my opinions in the matter of William Lins v. United States of America and my qualifications to offer those opinions.

I am a Board-Certified Psychiatrist. I am currently the Senior Consultant in the Department of Psychiatry at Tufts Medical Center and Clinical Associate Professor of Psychiatry at Tufts University School of Medicine in Boston, Massachusetts. I have wide experience in the field of psychiatry, including consultation psychiatry (care of medical/surgical inpatients), emergency psychiatry, and addiction psychiatry. I have experience treating inpatient psychiatric patients diagnosed with substance use disorders and post-traumatic stress disorder. I have experience with, and am familiar with the standard of care as it relates to, the supervision and oversight of psychologists, psychiatrists, and mental health care providers both in an inpatient and outpatient setting. A copy of my Curriculum Vitae further summarizing my training and experience is attached to this letter.

I have reviewed the following materials:

1. Depositions of William Lins, Erin Burns, Ph.D., Erin Romero, Ph.D., Aaron Jacoby, M.D., and Joshua Semiatin, Ph.D.
2. Records of the Administrative Investigative Board of the Baltimore Veterans Administration (2016-03RM)
3. March 2, 2016 Letter from Erin Romero, Ph.D. to Erin Burns, Ph.D.
4. April 4, 2016 Letter from Erin Burns, Ph.D. to the VA Maryland Health Care System/Drs. Robinson and Marshall
5. Medical records from William Lins' August 11, 2015 through December 3, 2015 admission to the VA
6. Undated copy of handwritten note from Mr. Lins to Dr. Burns
7. February 13, 2015 Report of Contact to Erin Romero, Ph.D. from unidentified staff member
8. March 6, 2016 Report of Contact between Dr. Thomas Russo and Dr. Joshua Semiatin
9. VA Patient Abuse Policy

EXHIBIT 1

Based upon my review of these materials, and my knowledge, training, and experience, it is my opinion that the Baltimore VA Medical Center breached accepted standards of care in their supervision and oversight of Erin Burns, Ph.D., and that these breaches in the standard of caused injury to Mr. Lins.

1. **Failure to appreciate and respond to "red flags" relating to boundary issues**

The documents and testimony that I have reviewed indicate that Dr. Burns demonstrated repeatedly throughout her employment with the VA that she had an inability to understand and apply appropriate boundaries between herself, her patients, and other staff. The records reveal that, prior to starting her relationship with Mr. Lins, she was involved in two different romantic/sexual relationships with other staff members. One of these "staff" members was actually a peer support specialist, who was a former patient. Apparently, these relationships spilled into the workplace and resulted in an actual physical altercation at the VA, and the filing of criminal charges.

I have not been provided the VA's Fraternization policy, but regardless of whether a formal policy prohibited inter-staff relationships, it would not be appropriate for a mental health care provider to engage in a personal relationship with a peer support specialist. Dr. Burns' supervisors at the VA were aware of her inappropriate personal relationships, including with a peer support specialist, and they were also aware of the fact that Dr. Burns' personal relationships were spilling over into the workplace and affecting patients of the unit. This was a red flag indicating that Dr. Burns did not have a good appreciation for appropriate clinical and workplace boundaries.

In addition, the materials indicate that Dr. Burns had a pattern of "unconventional" therapy practices that demonstrated poor judgment and understanding of appropriate clinical boundaries. In meetings with her supervisor, Dr. Romero, it was revealed that she was interested in taking patients out to dinner and accompanying them, alone, on a trip to Arlington cemetery. She was also noted to be playing ping pong on the unit after hours with patients and requesting that they walk her to her car after hours to keep her safe.  Dr. Burns was admonished to cease these inappropriate after-hours interactions with patients.  Dr. Burns was found to be not following the recommendations from her supervisors well after being told to stop these inappropriate interactions with patients due the boundary violations they represented.

Although apparently these "therapeutic" proposals and other boundary violations were discussed in group meetings and in direct supervisory sessions between Dr. Romero and Dr. Burns, neither Dr. Romero nor anyone else at the VA took any action to remove Dr. Burns from patient care. Dr. Romero testified that she never had any "proof" that Dr. Burns had committed boundary violations with patients, but these repeated "red flags" were themselves should have been all the evidence that she needed in order to conclude that Dr. Burns did not have appropriate boundaries.  A thorough review of all the cases Dr. Burns was involved with should have been initiated.  There is no evidence

that Dr. Romero or any other supervisory staff ever inquired of Dr. Burns if there were any boundary crossings or other inappropriate interactions with any of her patients.

In sum, Dr. Burns repeatedly demonstrated through her relationships and interactions with VA staff, a peer support specialist, and her "unconventional" therapeutic strategies, that she had an inability to understand and maintain appropriate clinical and professional boundaries. This pattern of behavior was well-known to her supervisors in the Unit, who, based upon my review of the materials, failed to take proper action to ensure that Dr. Burns was properly supervised.

### 2. Failure to ensure a healthy and mutual supervisory relationship between Dr. Burns and her supervisor

In my opinion it was a violation of the standard of care for Dr. Romero to be supervising Dr. Burns. Dr. Romero testified that she "did not like" Dr. Burns, did not have good "feelings" about her, did not agree with her therapy approach, and found her a difficult person to supervise. She testified that she relayed this displeasure to her own supervisor, Dr. Jacoby. Dr. Burns similarly testified that she did not feel that she had an open relationship with Dr. Romero and received the support she expected of a supervisor.

Given Dr. Romero and Dr. Burns' mutual discomfort with each other, the standard of care required Dr. Romero and Dr. Jacoby to arrange for a different clinical supervisor for Dr. Burns. Allowing Dr. Romero to continue to supervise Dr. Burns given Dr. Romero's discomfort and dislike of Dr. Burns was a set-up for Dr. Burns to act with impunity, because there was no one in a supervisory role who apparently felt comfortable to confront Dr. Burns about her patterns of behavior. Dr. Romero's aversion to Dr. Burns personally and professionally limited and impaired her ability to objectively supervise Dr. Burns and take appropriate action when confronted with her ongoing boundary crossings and violations.

### 3. Failure to separate Dr. Burns and Mr. Lins after receiving knowledge of a potential boundary violation

Finally, I believe that the VA breached the standard of care in its supervision of Dr. Burns by failing to take action to remove Dr. Burns from patient care and directly confront her when it was discovered that Mr. Lins left a note under her door asking her to attend a wedding with him. Although Dr. Semiatin disputed reading this letter himself, it is undisputed that Dr. Burns shared with him the fact that the letter contained a request to attend a wedding with Mr. Lins alone. The content of the letter was shared with Dr. Romero, and discussed in a group meeting with other patients.

In my experience, the fact that Mr. Lins considered it to be appropriate or reasonable to invite Dr. Burns to a wedding is a clear indicator that the patient had inappropriate perceptions of boundaries between therapist and patient. Although Dr. Burns apparently discussed the fact that it would not be appropriate for her to attend a

wedding with Mr. Lins, it does not appear that Dr. Semiatin, Dr. Romero, or anyone else at the VA confronted Dr. Burns about the nature of her relationship with Mr. Lins and directly asked her whether she or Mr. Lins had developed personal feelings towards each other or were engaged in a personal relationship. I believe that the standard of care required Dr. Burns to be removed from Mr. Lins care and a deeper investigation into their relationship needed to occur.

Regards,

Manuel N Pacheco, MD, FACLP, DFAPA

58 Day Street #440304
Somerville, Massachusetts 02144
***Verba Volant Scripta Manent***